[Cite as *In re OPC Polymers v. Pub. Utilities Comm. of Ohio*, 2013-Ohio-5443.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of : OPC Polymers, | : | |
| Appellant, | : | |
| | | No. 12AP-735 |
| v. | : | (PUCO No. 11-5330-TR-CVF) |
| The Public Utilities Commission of Ohio, | : | (REGULAR CALENDAR) |
| Appellee. | : | |

D E C I S I O N

Rendered on December 12, 2013

*Roetzel & Andress*, and *Douglas M. Kennedy*, for appellant.

*Michael DeWine*, Attorney General, *Ryan P. O'Rourke* and *John H. Jones*, for appellee.

APPEAL from the Public Utilities Commission of Ohio

VUKOVICH, J.

{¶ 1} Appellant, OPC Polymers,[1] brings this direct appeal pursuant to R.C. 4923.99(C) from an order of appellee, the Public Utilities Commission of Ohio (hereinafter "commission" when referring to specific procedural determinations in this case, or "PUCO" when referring to administrative staff actions or general regulatory context). The order upholds a civil forfeiture imposed by the commission's staff. This civil forfeiture, essentially a regulatory fine, is based upon a violation of rules covering the transportation of hazardous materials.

{¶ 2} With one exception that we reserve for later discussion under OPC Polymers' fourth assignment of error, the facts in this case are not in dispute. OPC

---

[1] Neither the parties nor the commission have discussed the formal status of this business entity. We take judicial notice that OPC Polymers is a trade name registered to the Yenkin-Majestic Paint Corporation, 1920 Leonard Avenue, Columbus, Ohio. This also appears to be the location at which the truck-loading activity discussed below took place.

Polymers shipped a load of paint resin from its facility in Columbus, Ohio to Greensboro, North Carolina. This flammable resin, contained in 55-gallon drums, constituted hazardous material subject to heightened safety restrictions in transportation, including requirements for load securement ("blocking and bracing"). OPC Polymers used its own dock personnel and fork lift to load this cargo onto a truck operated by USF Glen Moore Transport, Inc. ("USF Glen Moore") in the presence of USF Glen Moore's driver. The driver, upon completion of loading, signed a bill of lading containing a notation that the driver, as agent of the carrier, approved the load securement.

{¶ 3} In transit, a roadside inspection by PUCO personnel revealed that the load lacked a bracing bar or other means of preventing the drums from shifting towards the rear of the truck. USF Glen Moore's driver secured the load on the spot and proceeded with his delivery.

{¶ 4} USF Glen Moore subsequently paid without dispute a forfeiture for the violation of applicable hazardous materials transportation regulations ("HMRs") based on the improperly-secured load. The initial staff report from PUCO concluded that, as a shipper that undertook to load a truck, OPC Polymers could be jointly liable for any HMR violations with the carrier that operated the truck. PUCO then served OPC Polymers with a notice of violation based on the same occurrence.

{¶ 5} OPC Polymers objected to the PUCO staff determination and appealed therefrom. OPC Polymers asserted that applicable regulations placed all responsibility for load securement on the carrier, even if the shipper had participated in loading the truck. The matter proceeded to a hearing before the commission, which heard extensive testimony and reviewed the disputed regulations. The commission agreed with the conclusions in the staff report regarding shipper liability. The commission, however, sought to limit the scope of its determination as follows: "Our opinion in this case is limited to the finding that, after OPC Polymers had loaded hazardous materials onto the transport vehicle, the company did not ascertain that the cargo was secure." (Appellant's appendix, A. Commission Opinion and Order, at 8.) By this statement, it appears that the commission intends to create a distinction for regulatory purposes between: (1) requiring the shipper to actually provide the labor and materials to secure the load, and (2) merely asking the shipper to ascertain whether the carrier has done so.

{¶ 6} OPC Polymers appeals from the commission's order and brings the following four assignments of error:

[I]. The Commission erred as a matter of law in finding that 49 CFR §173.30 places a duty on a shipper who loads hazardous materials to also block and brace the load.

[II]. The Commission made errors of law interpreting and distinguishing pre-transportation and transportation functions under 49 CFR §171.1 and §171.2.

[III]. The Commission erred as a matter of law by finding that shipper and carrier are jointly responsible for the same act or omission in failing to block and brace the load.

[IV]. The Commission Staff violated Appellant's due process rights and the Commission erred as a matter of law by upholding this violation.

{¶ 7} This appeal is brought under R.C. 4923.99(C), pursuant to which this court will determine appeals "in the same manner, and under the same standards, as the supreme court hears and determines appeals under Chapter 4903." "R.C. 4903.13 provides that a PUCO order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable." *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, ¶ 50. While we are severely constrained in our review of a PUCO decision insofar as it resolves issues of fact and evidentiary questions, *Elyria Foundry Co. v. Pub. Util. Comm.*, 114 Ohio St.3d 305, 2007-Ohio-4164, the present appeal alleges only errors of law, which we review de novo. *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.*, 76 Ohio St.3d 163 (1996). In this de novo review of questions of law, however, we review the matter with due deference to the commission's expertise in its own field of regulation. *Braddock Motor Freight, Inc. v. Pub. Util. Comm.*, 174 Ohio St. 203 (1963), paragraph four of the syllabus.

{¶ 8} On appeal, the parties agree that relevant case law is sparse and this court must deal with much of the matter as a case of first impression. The fundamental question in this case is whether a shipper who loads hazardous material onto a truck operated by a common carrier can be held liable for a regulatory violation when neither the carrier nor the shipper properly blocks and braces the load against shifting. The duties of shippers

and carriers in this domain are governed by an array of federal regulations promulgated by the United States Department of Transportation ("USDOT"). These are incorporated into Ohio law by reference. Ohio Adm.Code 4901:2-5-02(A) (adopting 49 C.F.R. 171 through 180 and charging PUCO with enforcement).

{¶ 9} The commission argues persuasively that its interpretation of federally-promulgated regulations that are formally adopted by the state should be accorded the same deference given to its interpretation of regulations promulgated directly by the state. We agree, at least with respect to areas in which PUCO is statutorily charged with current enforcement of such federal regulations. *See, e.g.*, *In re Cities of Annandale and Maple Lake*, 731 N.W.2d 502 (Minn.2007); *Yelder v. Hornsby*, 666 F.Supp. 1518, 1521 (S.D.Ala.1987) ("absent clear and unambiguous language in the federal regulation, a court must give deference to any reasonably acceptable interpretation by the federal agency or, in the absence of a federal interpretation, by the state agency).

{¶ 10} OPC Polymers' first assignment of error asserts the commission erred in finding that one of the two applicable regulatory sections, 49 C.F.R. 173.30, requires the shipper to block and brace a load where the carrier has not done so. OPC Polymers argues that the language of this section does not create such a duty. OPC Polymers also argues that industry custom places the burden on the carrier to secure the load and that, in this case, the carrier contractually assumed the responsibility to do so.

{¶ 11} 49 C.F.R. 173.30 states in pertinent part as follows: "A person who is subject to the loading and unloading regulations in this subchapter must load or unload hazardous materials * * * in conformance with the applicable loading and unloading requirements of parts 174, 175, 176, and 177 of this subchapter."

{¶ 12} The commission concluded that by loading USF Glen Moore's truck, OPC Polymers became "subject to the loading and unloading regulations" in the above-listed sections. Specifically, PUCO staff initiated enforcement for this violation by citing OPC Polymers under the same subsection invoked to cite USF Glen Moore. 49 C.F.R. 177.834(a) states:

> Packages secured in a motor vehicle. Any package containing any hazardous material, not permanently attached to a motor vehicle, must be secured against shifting, including relative motion between packages, within the vehicle on which it is being transported, under conditions normally incident to

> transportation. Packages having valves or other fittings must
> be loaded in a manner to minimize the likelihood of damage
> during transportation.

{¶ 13} The term "secured against shifting," as found above, is used more or less interchangeably by all parties in the case with the perhaps more specific industry terms "blocking" and "bracing." These terms, as used with respect to transportation of cargo, do not appear in the hazardous materials regulations, but are defined in related chapters in the Code of Federal Regulations governing motor carrier safety, applicable to transportation of both hazardous and non-hazardous cargo:

> Blocking. A structure, device or another substantial article
> placed against or around an article of cargo to prevent
> horizontal movement of the article of cargo.
>
> * * *
>
> Bracing. A structure, device, or another substantial article
> placed against an article of cargo to prevent it from tipping,
> that may also prevent it from shifting.

49 C.F.R. 393.5.

{¶ 14} This section also defines terms of art for other means of securing cargo including "[d]unnage," "[d]unnage bag," "[e]dge protector," "[f]riction mat," "[s]horing bar," "[t]iedown" and "[v]oid filler." 49 C.F.R. 393.5.

{¶ 15} Before directly examining the language of these regulations, we address OPC Polymers' arguments that both common industry practice and the express terms of the shipping transaction here placed on the carrier the entire burden to secure the load. OPC Polymers presented evidence at the hearing before the commission to establish that the "widespread understanding in the industry" assigns responsibility for blocking and bracing to carriers. (Appellant's brief, at 13.) OPC Polymers also introduced the bill of lading covering the shipment and argued that, under its terms, the driver acknowledged on behalf of USF Glen Moore that the load had been blocked and braced, and that this acknowledgement represented a contractual assumption by the carrier of any legal duty to secure the load.

{¶ 16} Admitted as an exhibit was the USDOT's Federal Motor Carrier Safety Administration booklet "How to Comply with Federal Hazardous Materials Regulations."

(PUCO's exhibit No. 5.)  OPC Polymers alleges that this government-produced pamphlet instructs the regulated community that shippers are not responsible for blocking and bracing, and that motor carriers bear full responsibility for this function.

{¶ 17} OPC Polymers also placed evidence before the commission showing that leading safety training firms produce training materials that instruct clients' shippers, including OPC Polymers, about shipper duties, and that these training materials provide no instruction regarding shipper responsibility for blocking and bracing.  The testimony of Andrew Smith, the chief operating officer for OPC Polymers, was summarized by the commission as follows: "the carrier is best equipped and best suited to perform blocking and bracing. * * *  [L]oad securement equipment is expensive and, if OPC Polymers were to purchase such equipment and secure loads with it, that equipment would leave the company's premises in the truck and might never be seen again."  (Commission Opinion and Order, at 4.)

{¶ 18} We initially note that Mr. Smith's testimony, with respect to the practicality of requiring a shipper to provide bracing bars, while undoubtedly appropriate for a cargo of uniformly-sized and loaded 55-gallon drums as found in the present case, might in other circumstances be utterly inapplicable.  Federal regulations certainly contemplate the use of tools other than the bracing bars commonly carried on trucks to prevent backward-movement of loads: the above-quoted regulations mention dunnage, inflatable dunnage bags, specialized padding, specialized strapping, and other forms of void filler or dunnage peculiarly adapted to the unique cargo needs of the shipper.  While this particular load was amenable to securement with equipment that is by all accounts routinely owned and furnished by the carrier, other hazardous cargo may present securement problems that the shipper, rather than the carrier, is far better equipped to resolve.  We hesitate to declare a rule of general application based only upon the practical solution suggested by the specific facts before us.

{¶ 19} More to the point, the practicality of providing securement is not dispositive of the application of federal regulations, and OPC Polymers admits as much in its brief: "Appellant does not argue that industry understanding, experts, or contracts between the parties should outweigh the clear meaning of the law."  (Appellant's brief, at 15.)  The commission, moreover, did not rule that the shipper would be responsible for providing loading bars, but only that the shipper would be responsible for ensuring that loading bars

or other means had been properly applied to block and brace the load. The material obstacles suggested by OPC Polymers, therefore, cannot form the basis for our decision in this case.

{¶ 20} With respect to its argument that obligation to secure the load rested by contractual agreement upon USF Glen Moore, OPC Polymers stresses the terms of the bill of lading, with its specific notations that the driver and carrier had undertaken to secure the load properly. We note that while OPC Polymers could contractually delegate the task of securing the load, it could not contractually delegate its legal liability, if any, for failure to secure. The notation on the bill of lading, therefore, is not dispositive.

{¶ 21} In sum, practical considerations or contractual custom in the industry would not supersede express government regulation, even if they would certainly have weight in the commission's interpretation and application of those regulations. In other words, if industry custom or a contractual agreement are in derogation of law, a shipper in violation of the law cannot be exonerated by pointing to adherence to a customary practice.

{¶ 22} We now turn to the language of the regulations themselves. The commission relied on 49 C.F.R. 173.30 for the proposition that OPC Polymers, as shipper, was liable for any violation of HMRs, because this section states that persons who undertake loading of materials governed by the regulations must do so in conformance with all regulations. The commission extended this to find that, by loading the drums of paint resin, OPC Polymers assumed a duty to do so in conformity with all other applicable regulations, and this included the blocking and bracing requirements under section 49 C.F.R. 177.834(a). OPC Polymers now argues that, at best, pursuant to 49 C.F.R. 177.800(b), by loading the truck it assumed a responsibility to perform only *loading* in conformance with regulations, and the commission incorrectly extended that responsibility beyond loading to all regulatory requirements ancillary to loading, such as securing the load.

{¶ 23} OPC Polymers thus fully accepts that specific requirements imposed on loading must be complied with once a shipper assumes the loading function: making sure warning labels are visible (49 C.F.R. 177.834(b)), banning smoking or fire hazards in the vicinity (49 C.F.R. 177.834(c) and (d)), and using appropriate equipment that will not damage containers (49 C.F.R. 177.834(f)). OPC Polymers posits, however, that other

regulatory requirements not directly connected with the loading process cannot be directly imposed on the shipper, and that blocking and bracing are not part of the loading process.

{¶ 24} We agree. In the final analysis, we find that the interpretation given to 49 C.F.R. 173.30 by the commission is overbroad and imposes a liability on shippers of which they have no fair warning in the language of the regulation. This section mentions loading and unloading of hazardous materials, but makes no reference to securement.  If the federal government, and by adoption the state of Ohio, had sought to specifically impose a duty on shippers who load to also secure the load, that section could clearly have indicated as much.  The fact that 49 C.F.R. 173.30 does not expressly mention securement is manifestly not by economy of language, but by limitation of intent.  As such, we must first examine the plain language of the regulation when the meaning is clear and unambiguous.  *State v. Lowe*, 112 Ohio St.3d 507, 2007-Ohio-606, ¶ 9.  49 C.F.R. 173.30 does not clearly and unambiguously place responsibility for blocking and securing a load upon the shipper, and we find that the commission erred in concluding that OPC Polymers had violated the regulation in this respect.  OPC Polymers' first assignment of error is accordingly sustained.

{¶ 25} OPC Polymers' second assignment of error asserts the commission made errors of law in attempting to distinguish between pre-transportation and transportation functions under applicable federal regulations.  The distinction is important because pre-transportation functions imply liability for the shipper, whereas transportation functions are the exclusive responsibility of the carrier.  49 C.F.R. 171.1(b) and (c).  The commission concluded that when OPC Polymers loaded its cargo on the truck using its own dock personnel and equipment, it engaged in a pre-transportation function.  OPC Polymers asserts that loading of cargo in the presence of the carrier's driver is, by express definition, a transportation function.  49 C.F.R. 171.1(c)(2) states:

> Transportation functions. Requirements in the HMR apply to transportation of a hazardous material in commerce and to each person who transports a hazardous material in commerce * * *. * * * Transportation of a hazardous material in commerce includes the following:
>
> * * *

> (2) Loading incidental to movement of a hazardous material. Loading of packaged or containerized hazardous material onto a transport vehicle, aircraft, or vessel for the purpose of transporting it, including blocking and bracing a hazardous materials package in a freight container or transport vehicle * * *.

{¶ 26} While this section does define "loading incidental to movement" as a transportation function, we note that under pre-transportation functions, we can find "[l]oading, blocking, and bracing a hazardous materials package in a freight container or transport vehicle."  49 C.F.R. 171.1(b)(12).  We accordingly find that the commission did not err when it concluded that OPC Polymers had engaged in a pre-transportation function when it loaded its cargo onto the truck.

{¶ 27} The commission did err, however, based on our analysis of the first assignment of error, when it concluded that 49 C.F.R. 171.1(c)(2) placed a duty on a shipper who loads in the presence of carrier personnel to also block and brace that load. This section classifies functions, but creates no obligation to block and brace a load based on the language of this section.

{¶ 28} In accordance with the foregoing, OPC Polymers' second assignment of error is sustained in part and overruled in part.

{¶ 29} OPC Polymers' third assignment of error asserts the commission erred as a matter of law by finding that there could be joint responsibility on the part of the shipper and the carrier for the same act or omission in the shipping process.  To the extent that this assignment of error implicates issues that are addressed in our interpretation of 49 C.F.R. 173.30 and 173.834(a), pursuant to the first and second assignments of error, further discussion is duplicative and unnecessary. If, on the other hand, OPC Polymers seeks a declaration that the overall regulatory scheme under the HMRs could never contemplate joint liability for the same act and omission, we would be reluctant to offer such a broad holding even if the facts and posture of this case did not prevent us from reaching the issue.  Despite our finding that the regulation is too vague to impose liability upon OPC Polymers, we cannot find that there is any blanket obstacle to joint liability for violation of commission regulations governing the transportation of hazardous materials. The third assignment of error is sustained in part in the measure that it coincides with our conclusions under the first and second assignments of error, and otherwise overruled.

{¶ 30} OPC Polymers' fourth assignment of error asserts the administrative process culminating an issuance of the forfeiture in the current matter violated OPC Polymers' due process rights. On its face, the argument in support of this assignment of error does not set forth a constitutional violation, but only arguments regarding the manifest weight of the evidence or the sufficiency of the evidence before the commission to support the actual occurrence of a violation. OPC Polymers strives to create a material contested point of fact in this case: whether the truck, when stopped by the commission's agent some 50 miles from Columbus, was in the same condition as when it left OPC Polymers' premises.

{¶ 31} The bulk of OPC Polymers' evidentiary arguments concern the effect of the seal applied to the truck doors. The commission chose to make the permissible evidentiary assumption that the sealed load was, at the time of the vehicle inspection, in the same state as when it was sealed and left OPC Polymers' dock. Given our deference to the commission's proceedings with respect to the weight of the evidence, we will not strain to accept a less-likely inference over that chosen by the commission. Moreover, OPC Polymers does not suggest that there is any evidence, nor even any reason to infer, that the contents of the truck left the dock in a more secure or compliant condition than when stopped by a PUCO agent in transit. OPC Polymers' fourth assignment of error is overruled.

{¶ 32} In accordance with the foregoing, OPC Polymers' first assignment of error is sustained, second and third assignments of error are sustained in part and overruled in part, and fourth assignment of error is overruled. The order of the Public Utilities Commission of Ohio imposing a civil forfeiture penalty upon OPC Polymers is vacated.

*Order vacated.*

KLATT, P.J., and SADLER, J., concur.

VUKOVICH, J., of the Seventh Appellate District, sitting by assignment in the Tenth Appellate District.